# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LAMBDA OPTICAL SOLUTIONS, LLC,           )
                                         )
             Plaintiff,                  )
                                         )
        v.                               )
                                         )
ALCATEL-LUCENT USA INC. and              )
ALCATEL-LUCENT HOLDINGS INC.,            )
                                         )
             Defendants.                 )
_____)     Civil Action No. 10-487-RGA-CJB
ALCATEL-LUCENT USA INC. and              )
ALCATEL-LUCENT HOLDINGS INC.,            )
                                         )
             Counter-Claimants,          )
                                         )
        v.                               )
                                         )
LAMBDA OPTICAL SOLUTIONS, LLC,           )
LAMBDA OPTICAL SYSTEMS CORP., and        )
ANASTASIOS TZATHAS,                      )
                                         )
             Counter-Defendants.         )

## REPORT AND RECOMMENDATION

In this patent case filed by Plaintiff Lambda Optical Solutions, LLC ("Lambda" or "Plaintiff") against Defendants Alcatel-Lucent USA Inc. and Alcatel-Lucent Holdings Inc. (collectively, "Alcatel" or "Defendants"), Plaintiff alleges infringement of U.S. Patent No. 6,973,229 ("the '229 patent"). Alcatel timely answered Plaintiff's Complaint, and asserted counterclaims against Lambda, Lambda Optical Systems Corporation ("LOS"), and Anastasios Tzathas (collectively, "Counter-Defendants"), one of the named inventors of the '229 patent. Presently before the Court is Lambda and LOS' Motion for Partial Summary Judgment ("Motion"). (D.I. 359) For the reasons set out below, the Court recommends that the Motion be GRANTED.

## I.    BACKGROUND

### A.    The Parties

Lambda is a Delaware limited liability company with its principal place of business in Newport Beach, California. (D.I. 1 at ¶ 1) Defendants are Delaware corporations, with their principal places of business in New Jersey and Texas, respectively. (D.I. 74 at 9 at ¶¶ 1-2) Counter-Defendant LOS is a Delaware corporation with its principal place of business in Reston, Virginia. (*Id*. at ¶ 5) Counter-Defendant Mr. Tzathas is an individual residing in New Market, Maryland. (*Id*. at 10 at ¶ 6)

### B.    The '229 Patent

The '229 patent is entitled "Node Architecture for Modularized and Reconfigurable Optical Networks, and Methods and Apparatus Therefor," and was issued on December 6, 2005. (D.I. 178, ex. B)[1] The '229 patent lists three inventors: Mr. Tzathas, Moon W. Kim, and Abdella Battou. (*Id*.) Counter-Defendant LOS is the sole assignee of the '229 patent, and Plaintiff is its exclusive licensee. (D.I. 1 at ¶¶ 32-33) The '229 patent is based on U.S. Application No. 09/795,950, which was filed on February 28, 2001. The '229 patent contains 30 claims, four of which are independent (i.e., claims 1, 25, 26 and 27), and forty-nine figures. The '229 patent relates to the field of optical networking, which involves transmitting voice, Internet traffic, and other digital data over fiber-optic cables.

### C.    Mr. Tzathas' Employment at Alcatel's Predecessor Company

Mr. Tzathas began working at Lucent Technologies ("Lucent"), the predecessor to

---

[1]      The '229 patent appears several times on the docket, including as an exhibit to the parties' Joint Claim Construction Chart. (D.I. 178, ex. B) Further citations will simply be to the "'229 patent."

Alcatel-Lucent USA Inc., in February 1997. (D.I. 391, ex. 1 at A004-05) He executed an Employee Agreement Regarding Intellectual Property that required him to assign to Lucent all his rights to his work, whether patentable or not, during his employment with Lucent, and to maintain Lucent's private and proprietary information as confidential. (D.I. 101, ex. A) During his time at Lucent, Mr. Tzathas "played a leading role" in the MONET project, a five-year multi-wavelength optical networking research project undertaken by five technology companies and several government agencies, which lasted from approximately December 1994 through November 1999. (D.I. 352 at 11; D.I. 370, ex. 1 at A002; D.I. 365 at 1-2; D.I. 392 at 2)

### D.    Mr. Tzathas' Employment at LOS's Predecessor Company

In February 2000, LOS's predecessor, Princeton Optical Systems ("Princeton") was formed to compete in the fiber optics field. (D.I. 362, ex. 7 at A100; D.I. 391, ex. 28 at A168-69) It opened its headquarters and optics hardware development facility in Holmdel, New Jersey, (D.I. 362, ex. 7 at A100), in close proximity to Lucent's research facilities, (*see* D.I. 391, ex. 1 at A004; *see also* D.I. 436 (hereinafter, "Tr.") at 166). In August 2000, Mr. Tzathas left Lucent to work for Princeton—one of several former Lucent employees to do so. (D.I. 362, ex. 4 at A55; *id.*, ex. 11 at A397-98; D.I. 364, ex. 40 at A885-86)

In February 2001, Princeton filed the patent application for the '229 patent. ('229 patent) Towards the end of that year, Princeton introduced an optical networking switch product known as the "Intelligent Optical Switch IOS 1000" (or "Lambda Node 1000") which embodied the invention claimed therein. (D.I. 362, ex. 16 at A502; D.I. 364, ex. 40 at A895-96; *id.*, ex. 41 at A911) Alcatel alleges that its trade secrets—much of which stemmed from the MONET project—were disclosed in the '229 patent. (*See, e.g.*, D.I. 222 at 12 at ¶ 17; D.I. 388 at 4)

3

### E.    Procedural Posture

Plaintiff's Complaint, which was filed on June 4, 2010, originally alleged infringement

against 20 Defendants (D.I. 1); other than Alcatel, all of the other originally named Defendants

have been dismissed by stipulation. On January 24, 2011, Alcatel timely answered Plaintiff's

Complaint, and asserted counterclaims against Counter-Defendants. (D.I. 74) On March 28,

2012, this case was referred to the Court by Judge Richard G. Andrews to hear and resolve all

pretrial matters, up to and including the resolution of case-dispositive motions. Briefing on the

pending Motion was completed on January 8, 2014, and the Court held oral argument on the

Motion (and other pending motions) on March 5, 2014. (D.I. 436)

## II.    STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a

genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 585 n.10 (1986). If the moving party meets this burden, the nonmovant must then

"come forward with specific facts showing that there is a *genuine issue for trial.*" *Id.* at 587

(emphasis in original) (internal quotation marks omitted). If the nonmoving party fails to make a

sufficient showing on an essential element of its case with respect to which it has the burden of

proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in

favor of the nonmoving party, and it may not make credibility determinations or weigh the

evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

4

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.    DISCUSSION

With their Motion, Lambda and LOS seek summary judgment on the state law counterclaims currently asserted against one or both of them: Counterclaim 5 (Tortious

Interference with Contractual Relations) asserted against LOS, Counterclaim 6 (Misappropriation of Trade Secrets) asserted against LOS and Mr. Tzathas, Counterclaim 7 (Tortious Interference with Actual and Prospective Business Relations) asserted against Lambda and LOS, and Counterclaim 8 (Unfair Competition) asserted against Lambda, LOS and Mr. Tzathas—all of which arise under the laws of New Jersey. (D.I. 222 at ¶¶ 34-58; D.I. 360 at 1-2, 11, 16; D.I. 388 at 8)[2]

## A.    The Applicable Statute of Limitations

The threshold issue at the heart of the parties' briefing relates to whether New Jersey's statute of limitations applies to these state law counterclaims, or whether the shorter, Delaware statute of limitations should be applied instead. (D.I. 360 at 10-20; D.I. 388 at 13) Pursuant to Del. Code tit. 10, § 8121 (the "Delaware borrowing statute," the "borrowing statute" or "Section

---

[2]    There were 15 counterclaims asserted by Alcatel, 10 of which (Counterclaims 1-8 and 14-15) were state law-based counterclaims. The other counterclaims (Counterclaims 9-13) relate to the '229 patent. In their opening brief, Lambda and LOS also made reference to Counterclaim 1 (Breach of Contract), Counterclaim 2 (Breach of the Implied Covenant of Good Faith and Fair Dealing Related to the IP Agreement), Counterclaim 3 (Breach of Fiduciary Duty), and Counterclaim 4 (Breach of Duty of Loyalty), which were asserted against Mr. Tzathas alone. (D.I. 360 at 1) Counterclaims 2 and 3 were later dismissed entirely with prejudice by stipulation of the parties. (D.I. 387) As to Counterclaims 1 and 4, although Mr. Tzathas did not move for summary judgment as to them on the same grounds that Lambda and LOS do here, there is no dispute, (Tr. at 174), that the Court's decision below regarding the application of the Delaware borrowing statute would render those counterclaims subject to dismissal as having been filed after the applicable statute of limitations had run. Therefore, Alcatel's claims against Mr. Tzathas are addressed by the Court *sua sponte*. Lambda and LOS's opening brief also addresses Counterclaims 5-8. (D.I. 360 at 1) As to those, Counterclaim 6 was later dismissed with prejudice as to Lambda alone, Counterclaim 7 as to Mr. Tzathas alone and Counterclaim 8 as to Lamdba, LOS, and Mr. Tzathas (but only as to an unfair competition claim based on California law), all by stipulation of the parties. (D.I. 387) Those counterclaims otherwise remain asserted. Lastly, in their opening brief, Lambda and LOS addressed Counterclaim 14 (Conversion), which was filed against them and Mr. Tzathas, and Counterclaim 15 (Aiding and Abetting a Breach of Fiduciary Duty), which was filed against LOS. (D.I. 360 at 1) These counterclaims were later dismissed entirely with prejudice by stipulation of the parties. (*See* D.I. 387; D.I. 398)

8121"), when a cause of action arises outside of this State, the Court must apply the shorter of the Delaware statute of limitations and the statute of limitations of the place where the cause of action accrued. *TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 326-27 (D. Del. 2014). The precise wording of the Delaware borrowing statute is as follows:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.

Del. Code tit. 10, § 8121. There is no dispute between the parties that the state law counterclaims at issue here arose "outside of this State[.]" And there is no dispute that as to these counterclaims, the relevant Delaware statute of limitations is three years, while the relevant New Jersey statute of limitations (if it, instead, applied) is six years. (*See* D.I. 360 at 11, 16 (citing N.J. Stat. Ann. 2A:14-1, Del. Code tit. 6, § 2006 & Del. Code tit. 10, § 8106 ("Section 8106"); D.I. 388 at 8) The question is whether, although the literal terms of the Delaware borrowing statute would result in the implementation of Delaware's three-year statute of limitations here, the Court should nevertheless decline to apply the borrowing statute.

Alcatel argues that the Court should ignore the borrowing statute's terms, and should instead employ New Jersey's more forgiving statute of limitations. (D.I. 388 at 7-9) Its argument relies heavily on a single case from this District: *B. Lewis Prods., Inc. v. Bean*, No. 02-93-KAJ, 2005 WL 273298 (D. Del. Jan. 28, 2005). (D.I. 388 at 7-8, 13-14) *B. Lewis*, in turn, cites extensively to the key case in this area from the Supreme Court of Delaware: *Saudi Basic*

*Indus. Corp. v. Mobil Yanbu Petrochemical Co., Inc.*, 866 A.2d 1 (Del. 2005). (D.I. 388 at 8, 13)
Examination of these two cases is instructive, starting with the latter.

In *Saudi Basic*, the plaintiff and its two joint venture partners entered into a contract
governed by Saudi Arabian law. 866 A.2d at 6, 15. The plaintiff then brought an action against
the two joint venture partner defendants for declaratory relief in the Superior Court of Delaware,
seeking a ruling that it had not violated the contract. *Id.* at 6, 10. In response, the defendants
asserted counterclaims against the plaintiff in tort and for breach of contract. *Id.* at 6-7. The
parties disputed which statute of limitations (Delaware's or Saudi Arabia's) applied to those
counterclaims. *Id.* at 14-15. It was undisputed that the counterclaims were time-barred under
Delaware law, but not by Saudi law. *Id.* at 16.

The Supreme Court of Delaware acknowledged that if the Delaware borrowing statute
were "literally read and applied, [it] would cause the three-year Delaware limitations statute to
govern" the counterclaims. *Id.* The *Saudi Basic* Court, however, held that "literal construction"
of the Delaware borrowing statute in the case would "subvert the statute's underlying purpose"
(i.e., preventing forum shopping). *Id.* It explained that borrowing statutes such as Section 8121
are "typically" intended to address situations in which a plaintiff, who would otherwise be time-
barred from bringing his claim where the claim arose, files suit in Delaware because Delaware
has a longer applicable statute of limitations. *Id.* Under that "'standard scenario,'" the
borrowing statute operates to prevent the plaintiff from circumventing the shorter limitations
period mandated by the jurisdiction where the claim arose. *Id.* at 16-17. The *Saudi Basic* Court
then noted that the defendants had not chosen to litigate their counterclaims in Delaware for
reasons that fit that "standard scenario." *Id.* at 17. It also credited the trial judge's findings that

8

when the plaintiff filed its claim for declaratory relief in Delaware, it had done so because it was

"'shopping for the most favorable forum'" and looking to "obtain an adjudication that . . .

Delaware's three year statute of limitations barred [defendants'] [counter]claims." *Id*. at 17-18.

The *Saudi Basic* Court held that, in such circumstances, the "statute's fundamental purpose"

would be "subvert[ed,]" were the statute held applicable to the counterclaims at issue. *Id*.

Accordingly, it ruled that the longer, Saudi Arabian statute of limitations should apply to the

defendants' counterclaims, and that the counterclaims were thus not time-barred. *Id*. at 18.

In *B. Lewis*, the plaintiff brought an action for breach of contract and fraud in this Court.

2005 WL 273298, at *1. The defendant responded by bringing compulsory counterclaims

against the plaintiff and related third-party claims. *Id*. at *1-2. As in *Saudi Basic*, it was

undisputed that if the Court literally applied the Delaware borrowing statute, Delaware's three-

year statute of limitations would bar the defendant's counterclaims and third-party claims. *Id*. at

*1. However, New York's law applied to the substantive issues in the case, and if New York's

six-year statute of limitations was applied, the counterclaims would not be time-barred. *Id*. In

reasoning that literal application of the Delaware borrowing statute was inappropriate, this Court

looked to *Saudi Basic* and found that the "same kinds of considerations" were at play. *Id*. at *2-

3. That is, the *B. Lewis* Court determined that allowing the plaintiff to bring suit in Delaware and

"have the advantage of the shorter statute of limitations" with regard to the defendant's

compulsory counterclaims would "effectively encourage the forum shopping denounced by the

Delaware Supreme Court [in *Saudi Basic*], and it would unfairly deprive [the defendant] of rights

to which he may otherwise be entitled." *Id*. at *3.

Since the decision in *Saudi Basic* (and in *B. Lewis*), Delaware courts have come to

different conclusions regarding *Saudi Basic*'s core holding. Some have read the case to mean that the Delaware borrowing statute's terms *only apply* when a non-resident claimant engages in "forum shopping" by bringing a claim in Delaware in order to obtain a longer limitations period than what would be available in the jurisdiction where the claim arose. *See, e.g., Bear Stearns Mortg. Funding Trust 2006-SL1 v. EMC Mortg. LLC*, C.A. No. 7701-VCL, 2015 WL 139731, at *9 (Del. Ch. Jan. 12, 2015); *Furnari v. Wallpang, Inc.*, C.A. No. 13C-04-287 JRJ CCLD, 2014 WL 1678419, at *5 (Del. Super. Ct. Apr. 16, 2014). These decisions suggest that the statute's terms should be literally applied in just that one circumstance—in order to punish this particular form of forum shopping. However, other courts have read *Saudi Basic* to mean that the Delaware borrowing statute's terms *should apply in all circumstances unless* there is clear evidence that applying the statute would reward a party who intentionally engaged in forum shopping by filing suit in Delaware. *TrustCo Bank v. Mathews*, C.A. No. 8374-VCP, 2015 WL 295373, at *6-9 (Del. Ch. Jan. 22, 2015); *Huffington v. T.C. Grp., LLC*, C.A. No. N11C-01-030 JRJ CCLD, 2012 WL 1415930, at *8-9 (Del. Super. Ct. Apr. 18, 2012).

To be sure, this issue is not free from doubt. But the Court agrees with the reasoning in the latter set of decisions, for the reasons set out below.

First, this conclusion gibes more closely with the actual language used in *Saudi Basic* and with the tenor of that decision. As previously noted, the *Saudi Basic* Court explained that statutes like the Delaware borrowing statute were "typically" designed to address the "'standard'" scenario referenced above—situations where a plaintiff brings a claim in Delaware that is not time-barred, but where the claim would be time-barred if brought in the foreign jurisdiction whose substantive law applies. *Saudi Basic*, 866 A.2d at 16-17. But the *Saudi Basic* Court's use

10

of words like "typically" and "standard" indicates an acknowledgment that other circumstances (i.e., non-"typical" or non-"standard" circumstances) could well exist, under which the literal terms of the statute should also apply.[3]

Second, the *Saudi Basic* Court appeared particularly concerned with the fact that "it was [the plaintiff] who came to Delaware to obtain an adjudication that . . . Delaware's three year statute of limitations barred [defendants' claims]." *Id.* at 17. This suggests that the decision was motivated by: (1) the lower court's finding that "all indications strongly suggest that [the plaintiff] chose this forum to obtain a shorter statute of limitations[,]" *id.* at 15, and (2) the *Saudi Basic* Court's desire to avoid an "absurd and unjust result" were the statute's terms to be applied and the plaintiff's clear, intentional forum shopping to be rewarded, *TrustCo Bank*, 2015 WL 295373, at *8 (noting *Saudi Basic*'s "fairly narrow holding"). *See also Huffington*, 2012 WL 1415930, at *9 ("At most, *Saudi Basic* provides a very narrow holding with respect to borrowing statute jurisprudence in that the Supreme Court recognized that applying the borrowing statute in that scenario would 'basically turn the borrowing statute on its head for the purpose for which it was enacted.'") (citation omitted).[4]

---

[3]     *See Huffington*, 2012 WL 1415930, at *9 ("*Saudi Basic* did not create a broad rule banning the use of the borrowing statute in all situations except for the 'typical' scenario. Rather, it demonstrates the Delaware Supreme Court's unwillingness to allow the borrowing statute to be abused by a party shopping for a forum to avoid an adversary's counterclaims. The Delaware Supreme Court's use of the word 'typical' to describe the most frequent scenario in which the borrowing statute applies simply provides an example of the manner in which the borrowing statute operates.").

[4]     The Court acknowledges that there is language in *Saudi Basic* that could be read to suggest that its holding is not so "narrow." That is, the *Saudi Basic* Court at one point credits the trial judge's decision that "to apply the borrowing statute . . . would subvert the statute's fundamental purpose . . . by enabling [plaintiff] to prevail on a limitations defense that would never have been available to it had [its] [] claims been brought in the jurisdiction where the cause

Third, it makes sense that there would only be a "narrow" set of circumstances wherein the words of the Delaware borrowing statute would not be given effect. After all, if the words of a statute clearly require a particular outcome, courts typically require that outcome. That is, in such circumstances, a court is not free to disregard the statute's clear meaning simply because, in the Court's view, another alternative outcome would be preferable. *See TrustCo Bank*, 2015 WL 295373, at *7 (noting that while courts interpret statutes to give effect to the intent of the legislature, they are "not free to disregard the unambiguous language of a statute").[5] These principles suggest that the result compelled by the "literal language of [the Delaware borrowing] statute" should only be set aside in "extraordinary circumstances"—such as "on a set of facts similar to *Saudi Basic*" where there is clear "evidence of forum shopping[.]" *Id.* at *8.

Turning to the facts of this case, there are no such "extraordinary circumstances" at play, as no real evidence of forum shopping exists. The record does not suggest that when Lambda chose Delaware as the forum for filing suit, it was doing so with the purpose of ensuring that Alcatel's later-filed counterclaims would be time-barred. As Lambda and LOS point out, (D.I.

---

of action arose[.]" *Saudi Basic*, 866 A.2d at 17-18. That language, taken in isolation, could indicate that the borrowing statute should not be utilized in *any* situation where applying it would have the effect of "enabling [a plaintiff] to prevail on a limitations defense" that it could not have prevailed on had it filed in the other forum. But for the reasons set out herein, the Court does not think that this language should, in fact, be read this broadly.

[5]      *See also TL of Fla., Inc.*, 54 F. Supp. 2d at 327 (finding that although the circumstances of the case did not fall within the "circumstances with which Delaware was most concerned when it adopted its borrowing statute—as the Court is not confronted with a party that has brought its case to Delaware for the purpose of benefitting from Delaware's longer statute of limitations" the statute should apply in the case, as "it remains the fact that the literal language [of the statute] makes it applicable to the circumstances presented here"); *cf. New York ex rel. Schneiderman v. Intel Corp.*, Civ. No. 09-827-LPS, 2011 WL 6100408, at *4 (D. Del. Dec. 7, 2011) (noting that in determining whether to apply the Delaware borrowing statute, a court should begin with the "literal language" of the statute).

417 at 2), Lambda originally filed the Complaint against 20 Defendants, most of whom are unrelated to Alcatel, (*see* D.I. 1 at ¶¶ 2-26). Aside from Alcatel, none of the other named defendants were alleged to have their principal place of business in New Jersey. (*See id.* at ¶¶ 6-26) Thus, as compared to the circumstances in *Saudi Basic* (or *B. Lewis*)—where the plaintiff filed suit against two closely-related parties and a single party, respectively—here it is very difficult to infer that Lambda's filing decision was premised on "forum shopping." Put another way, it is hard to believe that in such a multi-faceted case, Lambda was driven to file here so as to: (1) avoid the longer statute of limitations in one particular jurisdiction (New Jersey); (2) regarding non-compulsory counterclaims that *might* be filed in the future by only one set of Defendants (Alcatel).[6]

Indeed, Alcatel appears to recognize this. Implicitly acknowledging that the record suggests Lambda "[did]n't knowingly and deliberately cause a forum shopping result to bring about a shorter statute of limitations," Alcatel nevertheless argues that the "impact and effect" of applying the borrowing statute would be "unfair" here. (Tr. at 162-64) It states that though these counterclaims were not compulsory, they are related to Lambda's allegations in the Complaint. (*Id.*) Thus, according to Alcatel, the "policy" expressed in cases like *Saudi Basic* and *B. Lewis* is that it would be impractical or unfair to have required it to "take these claims elsewhere" (e.g. to New Jersey) or lose them. (*Id.*)

Yet as noted above, the Court does not believe that *Saudi Basic* stands for the broad proposition that when a plaintiff files suit in Delaware and a defendant's counterclaims arise in

---

[6]     As for the other two Counter-Defendants, LOS and Mr. Tzathas, they could not be said to have forum shopped to anyone's detriment, as they were not plaintiffs and did not participate in filing the Complaint. (D.I. 417 at 2; Tr. at 126)

another state, it would in all cases be "manifestly unfair" to apply "Delaware's more restrictive statute of limitations." (D.I. 388 at 8)[7] Nor is the decision as to whether to apply the literal terms of the Delaware borrowing statute necessarily reliant on how closely related the counterclaims at issue are to a plaintiff's claims, or to how efficient it would be to try the counterclaims in Delaware (as opposed to another state). (D.I. 417 at 2); *cf. New York ex rel. Schneiderman v. Intel Corp.*, Civ. No. 09-827-LPS, 2011 WL 6100408, at *4 (D. Del. Dec. 7, 2011) (applying the Delaware borrowing statute—the literal terms of which applied to the case's circumstances—and rejecting plaintiff's argument that New York's longer statute of limitations should apply because the plaintiff filed its claims in Delaware "in the interest of efficiency[,]" since "[t]he [borrowing] statute contains no exception for when a party chooses to file suit in Delaware for purported 'efficiency' reasons"). The "policy" expressed in *Saudi Basic* is not one that focuses on the "impact and effect" on the defendant of applying the borrowing statute, to the exclusion of an examination of the plaintiff's motives.

Accordingly, the Court finds that the Delaware borrowing statute should apply to the counterclaims listed above. Because this statute provides that the Court should enforce the "shorter" of the "the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose," the Court will enforce Delaware's three-year statute of limitations. As Alcatel filed its counterclaims on January 24, 2011, (D.I. 74), the next issue to address is whether these counterclaims accrued before January 24, 2008.

---

[7]     *Cf. Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 580-81 & n.12 (E.D. Pa. 2014) (applying Pennsylvania's similarly-worded borrowing statute to bar defendants' counterclaims, finding no support for defendants' argument that the statute did not apply to such counterclaims).

**B.** **Application of Delaware's Three-Year Statute of Limitations and Assessment of the State Law Counterclaims**

Even Alcatel concedes that application of Delaware's three-year statute of limitations results in no more than three of these state law counterclaims remaining. (Tr. at 173-74) These are: Counterclaim 6 (Misappropriation of Trade Secrets), Counterclaim 7 (Tortious Interference with Actual and Prospective Business Relations) and Counterclaim 8 (Unfair Competition).[8] (*See id.* at 174) The Court will examine these counterclaims in turn.

**a.** **Counterclaim 6: Misappropriation of Trade Secrets**

The Court first addresses Counterclaim 6, which alleges misappropriation of trade secrets under the laws of New Jersey. Like other actions for misappropriation, this claim accrues when "misappropriation is discovered or by the exercise of reasonable diligence should have been

---

[8] That is, Alcatel concedes that remaining Counterclaim 1 (Breach of Contract) and Counterclaim 4 (Breach of Duty of Loyalty) against Mr. Tzathas and Counterclaim 5 (Tortious Interference with Contractual Relations) against LOS are time-barred if the Delaware borrowing statute is applied. For sake of completeness, the Court notes that it agrees with the premise of Alcatel's concession. It is undisputed that the statute of limitations for these counterclaims is set forth in Del. Code tit. 10, § 8106. *See E.I. Du Pont de Nemours & Co. v. Monsanto Co.*, No. CIV.A. 00-359-SLR, 2001 WL 652019, at *1 (D. Del. Feb. 14, 2001) (finding Section 8106 applicable to breach of contract, breach of fiduciary duty and tortious interference with contract claims) (citing cases). Section 8106 reads, in pertinent part: "no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action[.]" The Supreme Court of Delaware has "repeatedly held that a cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004); *see also Smithkline Beecham Pharm. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 450 (Del. 2000) ("[Section 8106] is not a 'discovery statute,' [thus,] the limitations period begins to run from the time the cause of action accrues. . . . This is so even if the plaintiff is ignorant of the cause of action.") (internal quotation marks and citation omitted). For all of these counterclaims, it is apparent that a wrongful act necessary to trigger accrual happened by no later than February 28, 2001, the date on which Mr. Tzathas filed the application that ultimately resulted in the '229 patent. (*See* D.I. 222 at 12-15 at ¶¶ 17, 32 & 35) As these counterclaims accrued before January 24, 2008, they are time-barred.

discovered." Del. Code tit. 6, § 2006; *see also Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. Civ. 98-80-SLR, 2005 WL 46553, at *4 (D. Del. Jan. 5, 2005). The parties primarily rely on two cases that address how this standard is applied in cases involving patented subject matter. (D.I. 360 at 12; D.I. 388 at 10-11) These two cases (both arising in this District and decided within five months of one another) are particularly instructive, in light of their contrasting outcomes.

The first case, relied upon here by Lambda and LOS, is *Raza v. Siemens Med. Solutions USA Inc.*, 607 F. Supp. 2d 689 (D. Del. 2009). (D.I. 360 at 12) In *Raza*, the plaintiff developed methods for evaluating and tracking the performance of medical professionals. 607 F. Supp. 2d at 690. After making a presentation about these methods, the plaintiff shared written materials with the defendants. *Id.* The defendants indicated that they were not interested in the software the plaintiff developed, but did not return the written materials. *Id.* at 691. The defendants then created, patented and launched their own hospital management software (which was allegedly based on the plaintiff's materials), with substantial press coverage relating to that launch. *Id.* at 691-92. Although defendants publically launched their product in October 2001, and their patent application was published in July 2002, the plaintiff asserted that he did not discover that the defendants had stolen his trade secrets until April 2003. *Id.* at 691-93. The plaintiff did not file suit in this Court until February 2006, when he alleged claims under Delaware state law for trade secret misappropriation and unjust enrichment. *Id.* at 691.

Taking these facts into account, the *Raza* Court stated that "[c]ourts have recognized that the public disclosure of products, as well as the publicly noticed filing of patent protection constitutes, at a minimum, constructive knowledge for purposes of discovering a claim based on

16

the misappropriation of trade secrets and commencing the limitations period under the statute." *Id.* at 693 (citing *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 182 F. App'x 994, 999 (Fed. Cir. 2006)). The *Raza* Court then continued by quoting a case from this Court:

> "[W]hen a patent is published containing a trade secret, it destroys the trade secret. *Patents serve to 'put the world on notice'* with respect to what the patentee claims to own; thus, any trade secret in a patent is no longer secret. Once a trade secret is destroyed, the statute of limitations begins to run because the misappropriation of that trade secret is no longer a continuing tort."

*Id.* (emphasis in original) (quoting *Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. Civ. 98-80-SLR, 2005 WL 388592, at *1 n.4 (D. Del. Feb. 2, 2005)). As there was no dispute that the suit had been filed more than three years after the publication of the patent application, the Court concluded that the plaintiff's claims were time-barred. *Id.* at 693-94.

Months later, this Court decided *Capricorn Pharma, Inc. v. Matrixx Initiatives, Inc.*, Civil Action No. 08-873-JJF, 2009 WL 2567022 (D. Del. Aug. 19, 2009). As in *Raza*, this case involved a plaintiff alleging that the defendants had misappropriated its trade secrets under Delaware law; defendants later published a patent application revealing these trade secrets. *Capricorn Pharma, Inc.*, 2009 WL 2567022, at *1-2. The *Capricorn* Court began by considering whether, as a *per se* rule, the publication of a patent application containing a trade secret should necessarily begin the running of the statute of limitations in all instances. *Id.* at *4-5. In determining that it should not—and that the trade secret misappropriation claim in that case did not accrue with the publication of the patent application—the *Capricorn* Court distinguished *Raza* on two "critical" and "equally important" points. *Id.* at *7. First, the plaintiff in *Capricorn* presented substantial evidence showing that the defendants had actively concealed their alleged trade secret misappropriation from the plaintiff, whereas the plaintiff in *Raza* "allege[d] [no]

17

facts that could have established" such fraudulent concealment. *Id.* at \*6-7. Second, there was no evidence in *Capricorn* (as there was in *Raza*) that the defendants had publicly launched a product that allegedly contained the trade secret, prior to the publication of the patent application. *Id.* at \*7.

From these cases, and others cited to by the parties, (*see* D.I. 360 at 11-12; D.I. 388 at 10-11), the Court understands that: (1) the publication of a patent (or patent application) allegedly containing a trade secret is an important factor in assessing whether a trade secret misappropriation claimant should have, through the exercise of reasonable diligence, discovered the misappropriation; but (2) it is not necessarily dispositive, and other factors can and should play a role in the inquiry. In engaging in this inquiry, a court should also examine whether there is evidence of fraudulent concealment (if alleged), and/or whether any other evidence exists to show that the claimant should have been on notice of the alleged misappropriation.

In this case, the '229 patent (containing the alleged trade secrets) was published on December 6, 2005. (D.I. 360 at 14) And there are a number of facts of record that, taken together, indicate that Alcatel "by the exercise of reasonable diligence" should have discovered any alleged trade secret misappropriation by no later than that date.

First, as even Alcatel's counsel stated at oral argument, Princeton was a "competitor" located "down the street" from Alcatel. (Tr. at 166, 170) As such, Princeton was a rival well known to Alcatel—one that was employing "[m]any" former Alcatel employees in the early 2000s. (*See id.* at 166)

Second, in both January 2001 and February 2001, Alcatel was sufficiently concerned by the "targeted hiring of certain key Lucent employees" that it wrote letters to Princeton

"request[ing] assurances[.]" (D.I. 362, ex. 4) In interrogatory responses, Alcatel states that these letters referenced the hiring of people like "Mr. Tzathas and other [former] Lucent employees"[9]—hirings that would "place at risk [these individuals'] obligations not to use confidential Lucent information." (Id., ex. 5 at A79) It is undisputed that no response to this letter was given. Thus, Alcatel never received the "assurances" it sought as to whether the hiring of these former Lucent employees might in fact lead to disclosure of trade secrets.

And third, in August 2002, Princeton publicly announced that it had been awarded a "$29 million research and development contract by the Naval Research Laboratory (NRL)." (D.I. 362, ex. 6 at A95) NRL was a customer that Alcatel had also been targeting. (Id., ex. 5 at A81) Pursuant to this NRL contract, Princeton was to develop optical network management and switching products. (Id., ex. 6 at A95; D.I. 360 at 13; D.I. 417 at 5-6)

Alcatel attempts to counter this evidence by suggesting that any evidence of trade secret misappropriation was fraudulently concealed. Yet it makes this claim in only one sentence of its answering brief. At the summary judgment stage, a party alleging fraudulent concealment must show "that there is sufficient evidence from which a judge or jury can find that facts were fraudulently concealed." *Studiengesellschaft Kohle, mbH v. Hercules, Inc.*, 748 F. Supp. 247, 253 & n.4 (D. Del. 1990).[10] In that one sentence, Alcatel alleges that Princeton and LOS "helped

---

[9]     Mr. Tzathas' hiring by Princeton was also made public on that company's website at that time. (D.I. 418, ex. 47-48)

[10]     Lambda points out that fraudulent concealment must be pled with specificity, and asserts that Alcatel failed to sufficiently plead fraudulent concealment in its counterclaims. (D.I. 417 at 7 (citing Fed. R. Civ. P. 9(b) and cases); Tr. at 141) While Lambda's argument appears strong—indeed, Alcatel's counterclaims fail to even mention the concept of fraudulent concealment, (D.I. 222)—the Court need not ultimately determine whether it was sufficiently pled, in light of the lack of evidence to support the claim at this stage.

conceal the source of the proprietary information in the '229 patent because it failed to cite the 'MONET' Project (on which Mr. Tzathas worked at Lucent) to the PTO during prosecution of the '229 patent." (D.I. 388 at 19)

That Alcatel did not further elaborate on this point is telling, particularly in light of the response from Lambda and LOS. Quite convincingly, that response pointed to a letter sent by Alcatel to Lambda's counsel after Alcatel received the Complaint in this case. (D.I. 417 at 7) In pertinent part, that letter reads as follows:

> The subject matter claimed in the '229 patent was developed by Lucent Technologies, Inc., ("Lucent") and is the property of ALU, the successor to Lucent. In this regard, I note that a named inventor of the '229 patent, Anastasios Tzathas was a Lucent employee until August of 2000. (The application for the '229 patent was filed on February 28, 2001.) Lucent employees developed the claimed inventions of the '229 patent during their employment at Lucent. The '229 patent is therefore an embodiment of the wrongful misappropriation of ALU property.

> I am attaching to this letter two articles. One of these articles, Anderson et al., *The MONET Project—A Final Report*, is dated December 2000, and names Anastasios Tzathas—a named inventor of the '229 patent—as an author. The other article, Johnson et al., *Advanced Optical Networking—Lucent's MONET Network Elements*, is dated January-March 1999, and acknowledges Mr. Tzathas as a contributor. These articles are not long, and after review of them, it is clear that the technology described therein was misappropriated and claimed in the '229 patent.

(D.I. 391, ex. 14) This letter reveals the weakness in Alcatel's bare-bones fraudulent concealment argument. On the one hand, Alcatel argues that Princeton's failure to include the MONET articles in patent prosecution somehow "helped conceal" the alleged source of the proprietary information from Alcatel (including its predecessor, Lucent, who actually participated

in the MONET project).[11] On the other, Alcatel's review of the '229 patent led it to the "clear" conclusion that it had developed the technology described in that patent. That contradiction demonstrates that there is insufficient evidence to support a claim of fraudulent concealment.

Ultimately, the history, level of competition and physical proximity between Princeton and Alcatel indicate that the exercise of "reasonable diligence" should have prompted Alcatel to review Princeton's '229 patent when it was published. And if Alcatel had done so, there is every reason to believe it would have come to the same conclusion then that it did after it read the Complaint—that the '229 patent was authored by a former employee and was premised on Alcatel trade secrets. While the facts here are not identical to those that this Court faced in *Raza*, they are sufficiently similar to drive the Court to the same conclusion.

Accordingly, the Court finds that Alcatel's claim for misappropriation of trade secrets accrued no later than December 6, 2005, the date on which the '229 patent was published. As Alcatel brought this claim on January 24, 2011, it did so outside of the three-year statute of limitations applicable to this cause of action. The Court therefore recommends that summary judgment be granted as to this claim.

### b.  Counterclaims 7 and 8: Tortious Interference with Actual and Prospective Business Relations and Unfair Competition

The Court next turns to Counterclaim 7 (Tortious Interference with Actual and Prospective Business Relations) and Counterclaim 8 (Unfair Competition)—the two other counterclaims left at issue.

As an initial matter, the Court notes that for these two counterclaims, the applicable

---

[11]    In this section of the Report and Recommendation, the Court will refer to Lucent and Alcatel interchangeably.

statute of limitations is also three years, but the applicable accrual standard differs. The statute

of limitations for these counterclaims is set forth in Section 8106. *See Medtronic Vascular, Inc.*,

2005 WL 46553, at *4 (applying Section 8106 to a claim of unfair competition); *E.I. Du Pont de*

*Nemours & Co. v. Monsanto Co.*, No. CIV.A. 00-359-SLR, 2001 WL 652019, at *1 (D. Del. Feb.

14, 2001) (applying Section 8106 to a claim of interference with prospective business

opportunity). As noted previously, *see supra* n.8, Section 8106 states that "no action to recover

damages caused by an injury unaccompanied with force or resulting indirectly from the act of the

defendant shall be brought after the expiration of 3 years from the accruing of the cause of such

action.[]" The Supreme Court of Delaware has "repeatedly held that a cause of action 'accrues'

under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of

action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004); *see also*

*Smithkline Beecham Pharm. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 450 (Del. 2000).

With this in mind, the Court turns to Alcatel's tortious interference with actual and

prospective business relations counterclaim. In looking at the allegations in this counterclaim, it

is not easy to track what allegedly tortious acts form the basis of this cause of action. The

counterclaim's allegations simply state that "the acts of Counter-Defendants set forth above were

and are intended to interfere with [Alcatel's] actual and prospective business relations." (D.I.

222 at 18 at ¶ 51) These allegations were clarified a bit in Alcatel's response to a Lambda

interrogatory, via which Lambda sought a detailed description of "the factual and legal basis"

supporting Alcatel's contentions for Counterclaim 7. (D.I. 362, ex. 5 at A59) In its response,

Alcatel once again vaguely stated that the relevant acts were those "set forth above[,]" but also

explicitly incorporated another prior interrogatory response. (*Id.* at A83-84) In that other

response, Alcatel referenced, *inter alia*, numerous allegedly tortious acts that occurred well before 2008. (*Id*. at A67-69) These acts included the "targeted hiring of key Lucent employees" by Princeton, that company's "inducing" Mr. Tzathas to breach a contractual agreement with Alcatel, and Mr. Tzathas' assignment of his interest in the patent application to Princeton (an assignment recorded with the United States Patent and Trademark Office on September 4, 2001). (*Id*. at A68) As Alcatel indicated at oral argument, (*see* Tr. at 159, 179-80), this response also made reference to acts occurring after Lambda filed this action (that is, acts occurring during the reexamination of the '229 patent), (D.I. 362, ex. 5 at A70). The applicable question, however, is when the counterclaim (i.e., the "cause of action") accrued. *See Wal-Mart Stores, Inc.*, 860 A.2d at 319. And here, because certain alleged wrongful acts pled in Counterclaim 7 occurred before January 24, 2008, then the counterclaim is time-barred.[12]

Turning next to Alcatel's counterclaim of unfair competition, the factual basis provided is a bit different. The allegations state that the allegedly unlawful conduct "includes, without limitation, Counter-Defendants' wrongful assertion of rights to the inventions disclosed in the '229 patent." (D.I. 222 at 18 at ¶ 56) The counterclaim thereafter asserts that such conduct includes "Counter-Defendants' continued improper assertion of rights to the inventions disclosed in the '229 patent and the resulting assertion of infringement of that patent[.]" (*Id*. at 19 at ¶ 58) A later interrogatory response says little more than this. (*See* D.I. 362, ex. 5 at A85-86) And Alcatel's answering brief claims that this counterclaim involves but two specific types of post-

---

[12]       At times, Alcatel appears to argue that, as to this counterclaim, the Court should either separately consider or focus exclusively on the alleged conduct occurring post-litigation (i.e., conduct that occurred during the reexamination). (D.I. 388 at 26-27) Yet even were the Court to do so, for the reasons set out next with respect to Alcatel's unfair competition counterclaim, that conduct could not give rise to a viable cause of action.

litigation conduct: (1) Lambda and LOS' "mischaracteriz[ation] [of] the MONET work Mr. Tzathas was involved in and the scope of the '229 patent" during reexamination proceedings; and (2) Lambda's "intentional pursuit of this litigation" despite knowing that there is a material dispute as to the ownership of the '229 patent. (D.I. 388 at 26-27; *see also* Tr. at 160)

It might be possible to (as Alcatel suggests) read the counterclaim's reference to the offending "wrongful assertion of rights" to involve only the two forms of above-referenced post-litigation conduct. If so read, then since Alcatel asserted the counterclaim less than eight months after the Complaint was filed, (*see* D.I. 1, D.I. 74), the cause of action would have accrued within the statute of limitations period.

However, Lambda and LOS next argue that even if Alcatel's unfair competition counterclaim is not time-barred, it otherwise fails because there is no allegation of "bad faith market-directed communications or conduct." (D.I. 417 at 15) Even accepting Alcatel's contention that the counterclaim includes only the two types of post-litigation conduct referenced above, summary judgment should be granted on this ground. As to the alleged actions taken during reexamination proceedings, the Federal Circuit and other courts have held that allegations of "'inequitable or other unsavory conduct of parties to proceedings in the [PTO]'" cannot alone form the basis of a state law claim of unfair competition or tortious interference with business relations. *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1476-77 (Fed. Cir. 1998) (quoting *Abbott Labs. v. Brennan*, 952 F.2d 1346, 1355 (Fed. Cir. 1991)); *see also XpertUniverse, Inc. v. Cisco Sys., Inc.*, 868 F. Supp. 2d 376, 384-85 (D. Del. 2012); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, Nos. C 04-2000 CW, C 06-2929 CW, 2006 WL 2975587, at *2-3 (N.D. Cal. Oct. 18, 2006). As for the allegation that the filing of the Complaint and pursuit of this litigation

forms an adequate basis for the unfair competition counterclaim, the United States District Court for the District of New Jersey examined a claim of unfair competition under New Jersey law that was premised on the same factual basis, and found no authority indicating that this constituted a "viable theory." *Buying for the Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 331 (D.N.J. 2006). Accordingly, the Court recommends that summary judgment be granted as to Alcatel's claim of unfair competition.

## IV. CONCLUSION

For the reasons set out above, the Court recommends that Lambda and LOS' Motion for Partial Summary Judgment (D.I. 359) be GRANTED. More particularly, the Court recommends that summary judgment be granted in favor of Lambda, LOS and/or Mr. Tzathas[13] on Counterclaim 1 (Breach of Contract), Counterclaim 4 (Breach of Duty of Loyalty), Counterclaim 5 (Tortious Interference with Contractual Relations), Counterclaim 6 (Misappropriation of Trade Secrets), Counterclaim 7 (Tortious Interference with Actual and Prospective Business Relations) and Counterclaim 8 (Unfair Competition).[14]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

---

[13]      As the Court's reasoning applies with equal force to Mr. Tzathas, and Alcatel had sufficient notice and adequate opportunity to respond to the arguments presented, the Court recommends that summary judgment with respect to these counterclaims be entered for him as well. *See Ciba Specialty Chems. Corp. v. Hercules, Inc.*, 436 F. Supp. 2d 670, 683 n.6 (D. Del. 2006); *Don's Hydraulics, Inc. v. Colony Ins. Co.*, 417 F. Supp. 2d 601, 611 (D. Del. 2006).

[14]      Lambda and LOS raise a number of other issues in their Motion, (*see* D.I. 360 at 20-30), all of which are moot in light of the Court's conclusions above.

Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **August 13, 2015,** for review by the Court, along with an detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated: August 6, 2015

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE