# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LAMBDA OPTICAL SOLUTIONS LLC, )
)
       Plaintiff, )
)
       v. )
)
ALCATEL-LUCENT USA, INC. and )
ALCATEL-LUCENT HOLDINGS INC., )
)
       Defendants. )
_____ )
)
ALCATEL-LUCENT USA, INC. and )
ALCATEL-LUCENT HOLDINGS INC., )
)
       v. )
       Counter-Claimants, )
)
LAMBDA OPTICAL SOLUTIONS LLC, )
LAMBDA OPTICAL SYSTEMS CORP., and )
ANASTASIOS TZATHAS, )
)
       Counter-Defendants. )

Civil Action No. 10-487-RGA-CJB

## REPORT AND RECOMMENDATION

In this patent case filed by Plaintiff Lambda Optical Solutions, LLC ("Lambda" or "Plaintiff") against Defendants Alcatel-Lucent USA Inc. and Alcatel-Lucent Holdings Inc. (collectively, "Alcatel" or "Defendants"), Plaintiff alleges infringement of U.S. Patent No. 6,973,229 ("the '229 patent"). Alcatel timely answered Plaintiff's Complaint, and asserted counterclaims against Lambda, Lambda Optical Systems Corporation ("LOS"), and Anastasios Tzathas (collectively, "Counter-Defendants"), one of the named inventors of the '229 patent. Presently before the Court is Defendants' Motion for Summary Judgment of Invalidity regarding

anticipation (the "Motion").  (D.I. 363)[1]  For the reasons set out below, the Court recommends

that Defendants' Motion be DENIED.

## I.      BACKGROUND

### A.      Factual Background

The '229 patent is entitled "Node Architecture for Modularized and Reconfigurable

Optical Networks, and Methods and Apparatus Therefor," and was issued on December 6, 2005.

(D.I. 178, ex. B)[2]  The '229 patent lists three inventors:  Mr. Tzathas, Moon W. Kim and Abdella

Battou.  (*Id.*)  Counter-Defendant LOS is the sole assignee of the '229 patent, and Plaintiff is its

exclusive licensee.  (D.I. 1 at ¶¶ 32, 33)  The '229 patent is based on U.S. Application No.

09/795,950, which was filed on February 28, 2001.  The '229 patent contains 30 claims, four of

which are independent (i.e., claims 1, 25, 26 and 27), and 49 figures.

The '229 patent relates to the field of optical networking, which involves transmitting

voice, Internet traffic, and other digital data over fiber-optic cables.  Systems that operate in this

field convert electrical signals from one endpoint into optical signals (or light pulses) for

transmission along fiber-optic cables.  After transmission, the light pulses are converted back to

electrical signals at another endpoint, so that they can be received by a network user.

Optical signals are often physically combined, or "multiplexed," for fiber-optic

---

[1]      In this Motion, Defendants had moved for summary judgment of invalidity based on both anticipation and obviousness defenses.  (D.I. 363 at 1)  This Court has denied the Motion with respect to obviousness, but the Motion remains pending with respect to anticipation. (*See* D.I. 464 at 5-6)

[2]      The '229 patent appears several times on the docket, including as an exhibit to the parties' Joint Claim Construction Chart.  (D.I. 178, ex. B)  Further citations will simply be to the "'229 patent."

transmission over a single, high-speed "long-haul" fiber—a fiber cable that can transmit those signals over long distances. In wavelength division multiplexing ("WDM"), a fiber is shared by dividing the spectrum of light (or "wavelengths" of light). These "wavelength divisions" must be sufficiently spaced apart to prevent the multiple wavelengths from interfering with each other. The International Telecommunications Union ("ITU") has adopted standard wavelength spacing that should be used for such multiplexing, which is reflected in the "ITU grid." (*See* '229 patent, col. 18:9-11 ("The ITU grid specifies the minimum spacing and the actual wavelengths of the individual wavelengths in a WDM system.")) A wavelength that conforms to the ITU grid is considered "compliant." (*See, e.g., id.*, col. 5:63-64)

The '229 patent is directed to one aspect of optical networking: an optical transport switching system.[3] In both of the asserted independent claims (i.e., claims 1 and 25) of the '229 patent, the claimed optical transport switching system has five subsystems, as highlighted below in claim 1:

> An optical transport switching system for use in an optical network, comprising:
>
> an *optical access ingress subsystem* which is adapted to receive an optical signal associated with an access network;
>
> an *optical access egress subsystem*;
>
> a *transport ingress subsystem*;
>
> a *transport egress subsystem*; and
>
> an *optical switch subsystem* which is adapted to ingress the optical

---

[3]     In the fiber-optics context, a switching system (or "switch") is generally defined as "[a] mechanical, electrical, or optical device that breaks or completes a path in a circuit, or changes the path." (D.I. 192, ex. 2 at 899)

> signal into the optical network by optically coupling the optical
> access ingress subsystem to the transport egress subsystem and
> which is adapted to selectively provide optical coupling between
> the transport ingress subsystem and at least one of (1) the optical
> access egress subsystem, and (2) the transport egress subsystem.

('229 patent, col. 54:22-37 (emphasis added))  Asserted independent claim 25 closely tracks the

language of claim 1, except that instead of focusing on the two ingress subsystems, it has a

greater description of the two egress subsystems:

> An optical transport switching system for use in an optical
> network, comprising:
>
> an *optical access ingress subsystem*;
>
> an *optical access egress subsystem* which is adapted to direct the
> optical signal toward an access network;
>
> a *transport ingress subsystem*;
>
> a *transport egress subsystem*; and
>
> the *optical switch subsystem* is adapted to egress an optical signal
> from the optical network by optically coupling the optical signal
> from the transport ingress subsystem to the optical access egress
> subsystem and is adapted to selectively provide optical coupling
> between the transport egress subsystem and at least one of (1) the
> optical access ingress subsystem and (2) the transport ingress
> subsystem.

(*Id.*, col. 56:28–42 (emphasis added))

## B.    Procedural Posture

On November 26, 2013, Defendants filed their Motion, in which they moved for

summary judgment that the asserted claims of the '229 patent are invalid as anticipated and/or

rendered obvious by four published articles that describe various aspects of the MONET project

(the "MONET articles" or the "MONET references").  (D.I. 363)  On July 24, 2015, the Court

4

issued a Report and Recommendation recommending that Defendants' Motion be denied (the "First Invalidity R&R"). (D.I. 442) More specifically, with respect to Alcatel's anticipation defense, the Court recommended that summary judgment be denied upon finding a genuine issue of material fact as to the "threshold dispute" of whether the allegedly anticipatory references were enabled. (*Id.* at 8, 13-14) With respect to Alcatel's obviousness defense, the Court recommended that summary judgment be denied because Alcatel's Motion failed to satisfy its high burden of proving that the claimed invention would have been obvious to a skilled artisan at the time of the invention. (*Id.* at 21)

On September 30, 2015, Judge Richard G. Andrews issued a Memorandum Order adopting the Court's recommended disposition with respect to obviousness, but returning the matter of summary judgment on the issue of anticipation to the Court for resolution. (D.I. 464) Judge Andrews explained that, under the particular circumstances of this case, expert testimony would be required to "raise the issue" of enablement. (*Id.* at 5) On return to the Court, Judge Andrews suggested that the Court either (1) consider the enablement challenge resolved, and proceed to the merits of the anticipation arguments; or (2) allow the parties to amend their expert reports to address the enablement issue. (*Id.*)[4]

The Court chose the latter course, and permitted supplemental expert discovery with respect to enablement, followed by supplemental briefing addressing "enablement, and that also addresses anticipation more generally[.]" (D.I. 467 at 4; *see also* D.I. 478 at 3) Supplemental briefing was completed on July 8, 2016. (D.I. 502)

---

[4]    In setting out its decision in this Report and Recommendation, the Court will assume familiarity with the substance of its decision in the First Invalidity R&R, and with the substance of Judge Andrews' Memorandum Order.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  If the moving party meets this burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (emphasis in original) (internal quotation marks omitted).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v.*

6

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter

the outcome are "material," and a factual dispute is genuine only where "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is

merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."

*Id.* at 249-50 (internal citations omitted). A party asserting that a fact cannot be—or,

alternatively, is—genuinely disputed must support the assertion either by citing to "particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials"; or by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) &

(B).

### B.    Anticipation

A claim is anticipated under 35 U.S.C. § 102(a) or (b) if:

> (a) the invention was known or used by others in this country, or
> patented or described in a printed publication in this or a foreign
> country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication
> in this or a foreign country or in public use or on sale in this
> country, more than one year prior to the date of the application for
> patent in the United States . . .

35 U.S.C. § 102.[5] A patent claim is anticipated if each and every limitation is found, either

---

[5]    The Court relies here on the version of 35 U.S.C. § 102 in effect prior to passage
of the Leahy-Smith America Invents Act ("AIA"); this prior version of Section 102 applies to
patents (like the asserted patent here) that have an effective filing date prior to March 16, 2013.
*See Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1000 n.1 (Fed. Cir. 2014) (noting that the

expressly or inherently, in a single prior art reference. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1321-22 (Fed. Cir. 2003). This test mirrors, to some extent, the test for infringement, and "it is axiomatic that that which would literally infringe if later anticipates if earlier." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001).

In order to anticipate, however, a reference must, *inter alia*, enable a person of skill in the art (the "POSITA") to make the invention without undue experimentation. *In re Gleave*, 560 F.3d at 1334. The inquiry as to whether "undue experimentation" is required is "'not a single, simple factual determination, but rather . . . a conclusion reached by weighing many factual considerations.'" *Martek Bioscis. Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378 (Fed. Cir. 2009) (quoting *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)). Determining what level of experimentation qualifies as "'undue,' so as to render a disclosure non-enabling, is made from the viewpoint of persons experienced in the field of the invention." *Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research*, 346 F.3d 1051, 1055 (Fed. Cir. 2003). The United States Court of Appeals for the Federal Circuit has provided several factors that may be utilized in determining whether a disclosure would require undue experimentation (the "*Wands* factors"): (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of

---

"AIA amendments apply only to applications and patents with an effective filing date of March 16, 2013, or later").

the art; and (8) the breadth of the claims. *In re Wands*, 858 F.2d at 737.[6]

A district court should presume that a prior art printed publication is enabled. *Lambda Optical Sols. LLC v. Alcatel Lucent USA Inc.*, Civil Action No. 10-487-RGA, 2015 WL 5734427, at *1 (D. Del. Sept. 30, 2015). Ultimately, it is the patentee who bears the ultimate "burden of proving the nonenablement of [here, the prior art publication] before the district court." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003).[7] The patentee's burden is to overcome the presumption of enablement by a preponderance of the evidence. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1307 (Fed. Cir. 2006) ("On remand, the district court found that Amgen had met its burden of proving by a preponderance of the evidence that the Sugimoto patent was not enabled."); *Cubist Pharms., Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 661 (D. Del. 2014) ("The patentee, however, bears the burden of overcoming the presumption of prior art enablement by a preponderance of the evidence.") (citing *Amgen*, 314 F.3d at 1355-56).

"Whether a prior art reference is enabling is a question of law based upon underlying factual findings." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342-43 (Fed. Cir. 2005) (citation omitted). Thus, if there is a genuine dispute of fact as to whether a prior art reference is nonenabling, summary judgment may not be granted. *Cf. SRI Int'l, Inc. v. Internet Sec. Systems, Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008).

---

[6]    A court need not consider every one of the *Wands* factors in its analysis to find a disclosure enabling. *See Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012).

[7]    *But see Lambda Optical Sols. LLC*, 2015 WL 5734427, at *1 (citing *Robocast, Inc. v. Apple, Inc.*, 39 F. Supp. 3d 552, 566 (D. Del. 2014)).

Anticipation is a question of fact. *Id.* at 1343. If there are no genuine disputes underlying the anticipation inquiry, then the issue is ripe for judgment as a matter of law. *Id.* On the other hand, when presented with a motion for summary judgment on the ground that a prior art reference anticipates a patent's claims, a court may deny the motion if, for example, there are "[d]isputed material issues of fact concerning how one of ordinary skill in the art would understand disclosure of a particular technology[.]" *Robocast, Inc. v. Apple Inc.*, 39 F. Supp. 3d 552, 564 (D. Del. 2014); *see also OSRAM SYLVANIA, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 706 (Fed. Cir. 2012).

## III.    DISCUSSION

Alcatel asserts that each of the MONET articles anticipates independent claims 1 and 25, and dependent claims 13-16 and 23-24 of the '229 patent. (D.I. 484 at 20)  The parties' threshold dispute is whether the MONET articles' disclosures are enabled for Section 102 purposes. Lambda argues that, at a minimum, there are factual disputes regarding whether the MONET articles' disclosures are enabled, and thus summary judgment of anticipation must be denied. (*See* D.I. 488 at 2, 20)[8]  It also argues that for other reasons, summary judgment as to the question of anticipation would be inappropriate.

### A.    Enablement of the MONET Articles

---

[8]    In light of the Court's later conclusion that there is a genuine issue of material fact as to whether the MONET articles anticipate the claims of the patent-in-suit, the Court could have avoided addressing the enablement question (e.g., by assuming *arguendo* that the references were enabled, and nevertheless finding that a genuine issue of material fact exists as to anticipation). It has not taken this path here, and instead addresses the enablement issue first, and in full. This is because:  (1) the issue is one that has taken up a significant amount of the parties' time and effort in the lead up to this Report and Recommendation; and (2) the Court recognizes that objections may be filed as to its decision on the anticipation issue, and if that comes to pass, it wishes the District Court to have the benefit of its analysis on the enablement question.

### 1.    Section 102's Requirements

As an initial matter, the parties quarrel a bit with respect to what the law requires for prior art to be enabling for purposes of Section 102.  Alcatel points out that "absent a specific claim limitation, the prior art need not satisfy a particular efficacy, usefulness, or commercial viability criterion—and need only enable one to make a single embodiment covered by the asserted claim." (D.I. 502 at 4-5)  This is a correct statement of the law.  *See, e.g., Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1337 (Fed. Cir. 2010) ("It is well-settled that utility or efficacy need not be demonstrated for a reference to serve as anticipatory prior art under section 102.");[9] *see also In re Morsa*, 803 F.3d 1374, 1377 (Fed. Cir. 2015) ("For a prior-art reference to be enabling, it need not enable the claim in its entirety, but instead the reference need only enable a single embodiment of the claim.").  For its part, Lambda asserts that a reference cannot anticipate unless it is enabling in a way that allows the skilled artisan to make something that is *operable*, and so here, in Lambda's view, the question "is not efficacy or the level of quality, but whether the claimed switch is capable of dropping, adding, and routing signals that can be used by network users." (D.I. 488 at 10 (citing *United States v. Adams*, 383 U.S. 39, 50 (1966); *Freeman v. Minn. Mining. & Mfg. Co.*, 693 F. Supp. 134, 147 (D. Del. 1988), *vacated in part on other grounds by* 884 F.2d 1398 (Fed. Cir. 1989)).  Alcatel, in response, does not seem to disagree that to be enabled, a prior art reference must show a POSITA how to make an operable

---

[9]    Accordingly, Alcatel is correct in pointing out that "[t]he standard for enablement of a prior art reference for purposes of anticipation is lower than the enablement standard under [35 U.S.C.] § 112." (D.I. 484 at 4); *see, e.g., Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005).  To be enabling under Section 112, a patent must contain a description that enables a POSITA to make *and use* the claimed invention without undue experimentation. *See, e.g., Martek Bioscis. Corp.*, 579 F.3d at 1378.

11

version of the invention; instead, it faults Lambda as reading the "'operative'" requirement as meaning "useful." (D.I. 502 at 5 n.4; *see also id.* at 7 n. 8 (appearing to acknowledge that a prior art reference must enable a system that is operative but noting that "[a] particular level of performance is legally irrelevant"))

To the extent Alacatel's interpretation is correct—and Lambda is requiring that the MONET articles disclose not merely how to make an operative switch, but also how to make an operative switch meeting a *particular level of performance* that one would find to be truly "useful"—then Lambda's position is wrong. For purposes of anticipation, a prior art reference must "teach a skilled artisan to make or carry out what it discloses in relation to the claimed invention." *In re Antor Media Corp.*, 689 F.3d 1282, 1290 (Fed. Cir. 2012). While the MONET references must enable a POSITA to make an optical transport switching system that would operate in an optical network (with independent claims 1 and 25 claiming a system "for use in an optical network"), no more is required of the prior art than is required by the claims themselves.[10] *See, e.g., Ciba-Geigy Corp. v. Alza Corp.*, 864 F. Supp. 429, 438-39 (D. Del. 1994) (noting that "[w]hile anticipation . . . require[s] that the prior art teach an operative apparatus, there is no requirement concerning the quality of operation of such apparatus" and concluding that the prior art reference enabled the POSITA to create the invention where its disclosure permitted the creation of a transdermal nicotine patch exactly as described in claims 1 and 2 of the patent that would "succeed in delivering nicotine to the bloodstream through the skin" and although "such a patch may not perform well . . . . the performance of such a patch [is] irrelevant") (internal

---

[10]    Indeed, Lambda itself has acknowledged this principle. (D.I. 452 at 4 (explaining that "an enabling disclosure may not have to result in a product with a high level of commercial perfection (unless it is within the scope of a patent claim)"))

quotation marks and citation omitted), *affirmed in relevant part*, 68 F.3d 487 (Fed. Cir. 1995).

### 2.    Asserted Unresolved Fact Issues as to Enablement

With Section 102's legal requirements now set out, and with the presumption that the

MONET articles are enabled as our starting point, the Court next assesses Lambda's claim that

there are unresolved factual issues as to whether it can overcome the presumption.

Lambda's primary nonenablement argument is that the POSITA could not make an

operative optical transport switching system without addressing certain implementation details

that are not recited in the claims.[11]    (D.I. 488 at 7-10)  For an optical transport switching system

as claimed in the '229 patent to actually work, Lambda argues, the system must send, receive, and

add/drop signals carrying large amounts of data between the optical network and the access

network, such that those signals can actually be used by network users.  Thus, the claimed system

"must be able to add, drop, and route *stable, decipherable* signals."  (*Id.* at 1 (emphasis added);

*see also id.* at 6, 8)  And Lambda asserts that, in order for this to occur, the claimed system must

receive signals that have been properly conditioned to overcome challenges such as signal loss,

gain stabilization, noise reduction and power transients that arise when routing, dropping or

adding signals in such networks (a concept referred to as "signal conditioning" in the briefs and

accompanying exhibits).  (*Id.* at 1, 6, 8, 20 & n.21 (citing, *inter alia*, D.I. 489 (hereinafter,

"Lambda's Appendix"), ex. 1 at ¶¶ 53, 60; *id.*, ex. 10 at 74-75; *id.*, ex. 13 at ¶¶ 39-40))[12]  More

---

[11]    Lambda's argument with respect to this issue focused on independent claims 1 and 25, and so the Court focuses its analysis on those claims herein.

[12]    Lambda's expert, David A. Smith, Ph.D., defined "signal conditioning" as the management of a signal that passes through the collection of subsystems claimed in the invention of the '229 patent "in such a way that it [is] recoverable on the other end[,]" as the signal will "undergo some degree of degradation" as it travels through the system.  (Lambda's Appendix, ex.

specifically, Lambda's expert, David A. Smith, Ph.D., explains that:

(1)     "An essential aspect of the claimed [optical access ingress subsystem] is that it must receive signals properly conditioned for transport on the optical network. This follows from the fact that the incoming signals are passed directly through the subsystem without OEO conversion, retiming or any other processing than possible amplification. Accordingly the subsystem cannot improve, but can only degrade, incoming optical signal-to-noise ratio and jitter." (Lambda's Appendix, ex. 1 at ¶ 53);

(2)     "Like with [the optical access ingress subsystem], an essential aspect of the claimed [optical access egress subsystem] is that it must receive signals properly conditioned from transport on the optical network so that they can continue on to their destination in the optical access network. Incoming signals are passed directly through the subsystem without OEO conversion, retiming or any other processing than possible amplification. Accordingly the subsystem cannot improve, but can only degrade, incoming optical signal-to-noise ratio and jitter." (*Id.* at ¶ 57);

(3)     "[T]he switching subsystem must be capable of switching signals as stated in the Court's claim construction order. This 'capability to switch' would have informed a person of ordinary skill in the art at the time of the invention is that the switch subsystem as well as the various interfaces must be able to support error-free digital transmission of digital signals.[13] Thus, the subsystems generally must

---

10 at A0456-57) He further explained that "signal conditioning" could "broadly" encompass issues such as "resolution of gain tilt; ASE, or amplified spontaneous emission noise level; transient management; loss compensation with amplifiers; and, in addition, optical signal monitoring to . . . determine whether the signal has degraded, but also as feedback to the control of, for example, transport ingress and egress subsystems"—i.e., issues that "relate to the quality of the signal and the quality of the relative intensities of the wavelength channels." (*Id.* at A0460-61)

13      It appears that Lambda uses the phraseology "error-free transmission of signals" to refer to the transmission of usable signals (that have been properly "conditioned") through optical and access networks. (*See* D.I. 488 at 11-12)

> compensate for the impairments they add to the system,
> whether that impairment is loss, crosstalk or instability."
> (*Id.* at ¶ 69)

Lambda acknowledges that the claims of the '229 patent do not explicitly recite signal

conditioning as a claim limitation, but argues that the claims need not include every

"implementation detail, even if those details are necessary" for the claimed switch to be capable

of performing the recited functions. (D.I. 488 at 9-10) In other words, according to Lambda,

even though signal conditioning is not an express claim limitation, it is nevertheless required in

order for the claimed optical transport switch to be able to send, receive and add/drop signals

between the optical network and the access network that can be used by network users. (*Id.*; *see

also, e.g.*, Lambda's Appendix, ex. 10 at A0454-55 (Dr. Smith explaining that signal

conditioning is not a claim limitation "but . . . if you make a system that is useful in an optical

network, you have to address a number of issues" including signal conditioning, which he

characterized as "engineering enablement"))

Turning to the MONET articles, Lambda then argues that they are not enabling because

they "did not resolve the signal conditioning requirements needed to make the claimed

invention." (D.I. 488 at 11; *see also* Lambda's Appendix, ex. 13 at ¶ 41) Alternatively, Lambda

argues that even if the MONET project had itself successfully achieved transmission of usable

signals through optical and access networks, "the MONET articles would still fail to instruct a

[POSITA] *how* to implement these solutions to build the claimed switching system." (D.I. 488 at

11-12 (emphasis in original))

For its part, Alcatel asserts that signal conditioning and related issues (such as transient

control/protection, signal amplification and noise suppression) are not claim requirements, and

15

that Lambda's enablement argument therefore "improperly seeks to graft these" components into the claims to avoid invalidity. (D.I. 484 at 1 & n.1, 13-14)  In accordance with the Court's claim construction, the optical access ingress subsystem of claim 1 must receive one or more optical signals, originating from an access network, which are *compliant* with the optical network, and the optical access egress subsystem of claim 25 must direct one or more *compliant* optical signals from the optical network, toward an access network, where a "compliant" optical wavelength is one that conforms to the ITU standards. (*See* D.I. 234 at 3, 26)  Alcatel's expert, Paul R. Prucnal, Ph.D., asserts that Dr. Smith "fails to provide any textual support for his additional limitation that the compliant signals must also be conditioned for transport on an optical network. . . . [he] does not cite to either the claims or the specification in support." (D.I. 485 (hereinafter, "Alcatel's First Appendix"), ex. 13 at ¶ 133)  To that end, Dr. Prucnal opines that signal conditioning is not inherently required by the claims because, for example, "in some implementations signal conditioning may not be needed because the incoming signal is known to be compliant as received." (*Id.*)

That said, Alcatel does seem to acknowledge that the invention claimed in the '229 patent must generate *usable* signals, (*see, e.g.*, Lambda's Appendix, ex. 11 at A0722-23 (Dr. Prucnal agreeing that for the system "to work, the signal has to be good enough to be received")),[14] and that certain factors could degrade the signals as they traveled through the optical network, (*see,*

---

[14]     Dr. Prucnal also noted in his expert report, in a section entitled "Background of the Technology[,]" that "[o]nce a WDM signal travels across the long-haul backbone network . . . it must be extracted and delivered to a local, regional network so that actual end users (e.g., home or business Internet users) can use the signal." (Alcatel's First Appendix, ex. 13 at ¶ 76) According to Lambda, this statement underscores "that the claimed technology must work with optical and access networks such that it can deliver useable signals to network users." (D.I. 488 at 8)

*e.g.*, Alcatel's First Appendix, ex. 13 at ¶ 101 (Dr. Prucnal acknowledging that "it was well known that crosstalk, dispersion, temperature dependence, amplifier noise, gain flattening, and automatic gain control could all affect the transmission of data through an optical network")). But that is of no moment here, according to Alcatel, because "the implementation details required to make a single embodiment covered by the claims were well-known" in the art before February 2001. (D.I. 502 at 2; *see also id.* at 1-5; D.I. 484 at 14 & n.17 (internal citations omitted))

The Court is persuaded by Alcatel's position. That is, even if the claims require stable signals in order for the claimed system to operate, there is not a genuine issue of fact as to whether the MONET references are not enabled because they fail to describe how to generate such signals. This is because Lambda has not sufficiently shown that such "requirements" were *anything other* than well-known at the relevant time. The Court so concludes for at least the following three reasons.

First, as Alcatel points out, (D.I. 484 at 5), courts have made it clear that a prior art reference "need not enable [unclaimed limitations] in order to be deemed anticipating." *Aventis Pharms., Inc. v. Barr Labs., Inc.*, 335 F. Supp. 2d 558, 583-84 (D.N.J. 2004) (citing *Amgen*, 314 F.3d at 1325); *see also, e.g., Verizon Servs. Corp.*, 602 F.3d at 1337 (rejecting the plaintiff's argument that anticipatory references were not enabling because "they do not disclose or enable the 'basic claim requirement' of being able to make ordinary two-way telephone calls" where "none of the claims in the [patents-at-issue] actually recite performing two-way telephone calls"); *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, 45 F. Supp. 3d 881, 917 (W.D. Wis. 2014) (explaining that "plaintiffs must limit their enablement arguments to whether [the allegedly

17

anticipatory reference] was enabled with respect to [the claim limitation at issue] and not [an

unclaimed limitation]"); *cf. Melchior v. Hilite Int'l, Inc.*, 665 F. App'x 894, 899-900 (Fed. Cir.

2016) ("Our cases establish that prior art cannot be distinguished on the ground that it lacks

features that are not claim limitations.") (citing cases); *DDR Holdings, LLC v. Hotels.com, L.P.*,

773 F.3d 1245, 1252 (Fed. Cir. 2014) ("Anticipation challenges under [Section] 102 must focus

only on the limitations actually recited in the claims.").[15] The signal conditioning "requirement"

at issue here is indisputably not *expressly* required by the claims at issue, and so, in light of the

above-referenced case law, this "requirement" would seem to be a poor candidate for Lambda to

focus on in arguing nonenablement.

Lambda attempts to side-step the impact of this general rule with its argument that the

claims of the patent-in-suit do "not need to explicitly include every implementation detail, even if

those details are necessary to enable the device." (D.I. 488 at 9)  Lambda cites for support to two

Federal Circuit decisions regarding claim construction.  (*Id.*)  And in these two cases, the Federal

Circuit does reiterate the unremarkable principle that it is improper to import limitations into the

claims from the specification as "'the claims need not recite every component necessary to

enable operation of a working device'"—"[t]hat a device will only operate if certain elements are

---

[15]       Alcatel cites to other cases in its briefing that support this basic proposition.  (D.I.
484 at 5-6)  Exemplary is the cited case of *Turbocare Div. of Demag Delaval Turbomach. Corp.
v. Gen. Elec. Co.*, 45 F. Supp. 2d 110 (D. Mass. 1999).  There, the plaintiff conceded that the
focus in evaluating whether a prior art reference was enabling "is on the *claims*" but then argued
that the "'*disclosure* of the [asserted] patent' as a whole is necessary to teach one skilled in the
art how to make the inventions of Claims 1 and 2."  45 F. Supp. 2d at 114 (emphasis in original).
The Court rejected the plaintiff's argument that the prior art reference was not enabling, noting
that (in addition to the fact that the prior art reference was "identical in every pertinent respect"
to the claims at issue) extraneous limitations "cannot be dragged in through the back door to
avoid summary judgment."  *Id.*

included is not grounds to incorporate those elements into the construction of the claims."

*Markem-Imaje Corp. v. Zipher Ltd.*, 657 F.3d 1293, 1301 (Fed. Cir. 2011) (quoting *Rambus Inc.*

*v. Infineon Techs. Ag*, 318 F.3d 1081, 1093 (Fed. Cir. 2003)).  In one of the cases, *Markem-Imaje*

*Corp. v. Zipher Ltd.*, 657 F.3d 1293 (Fed. Cir. 2011), the Federal Circuit provided a helpful

example in support of this notion:  "[a] claim to an engine providing motive power to a car

should not be construed to incorporate a limitation for an exhaust pipe, though an engine may not

function without one."  *Id.*  Lambda then tries to tie the principle set out in these two cases to the

facts here by asserting that for the claimed system to generate usable signals, "signal conditioning

and system control . . . must be enabled by the prior art" though "the components which enable

the optical transport switch to do so should not be required as limitations to that claim, any more

than an exhaust pipe should be incorporated as a limitation to a claim to a car engine."  (D.I. 488

at 9-10 (internal citations omitted))

Yet even so, it is worth noting that Lambda does not cite a single case where prior art was

deemed non-enabling due to the fact that it did not adequately discuss unclaimed features from a

patent's specification.  (*See* D.I. 502 at 5)  This is likely because (as Alcatel notes) many such

unclaimed details tend to go unclaimed precisely because they either are the kind of detail that

are already within the knowledge of one skilled in the art (and would also have been recognized

as such at the time of the prior art reference at issue) or are non-essential to an operative claimed

invention.  (*Id.* at 5 & n.6)  At a minimum, this suggests that it is likely the rare case where a

prior art reference will be found nonenabling for failure to set out an unclaimed "implementation

detail" that is necessary to enable the claimed invention at issue.

Second, Alcatel pinpoints the logical reason why the asserted claims of the '229 patent do

19

not recite these supposedly necessary implementation details—that is, that the record demonstrates that they *were known* to a POSITA by February 2001. (D.I. 484 at 14-16; D.I. 502 at 4-5 (Alcatel asserting that there is "no dispute that claims do not need to recite every *conventional* component that goes into making a device") (emphasis in original)) In other words, as Alcatel explains, "while a novel gas engine may require an exhaust pipe to work, there is no need to recite a[] [conventional] exhaust pipe in the claim." (D.I. 502 at 5) In order to anticipate such a patent on the exemplary gas engine, then, prior art "directed to the purportedly novel gas engine [need not] also describe how to make a conventional exhaust pipe." (*Id.* (emphasis omitted))

Here, Dr. Prucnal opined that the concept of signal degradation and the need for signal conditioning was well-known in the art of optical networking before February 2001, and "before February 2001, there were well-known techniques to compensate for [the different types of] degradation in an optical system." (Alcatel's First Appendix, ex. 13 at ¶ 101) His report then discusses these known techniques to condition signals and to compensate for degradation issues—techniques such as crosstalk suppression, use of particular fibers, use of a thermistor and thermo-electric cooler, amplifier design, use of filters, and automatic gain control. (*Id.* at ¶¶ 101-11)[16] The claims do not themselves explicitly require any specific technique to deal with these issues; this appears to be because, as Alcatel aptly notes, "if Lambda invented a breakthrough

---

[16]     Indeed, as Alcatel points out, (D.I. 484 at 15-16 & n.17; Alcatel's First Appendix, ex. 13 at ¶ 101), in a previous declaration submitted with respect to Alcatel's misappropriation of trade secrets claim, even Dr. Smith seemed to acknowledge that as of the critical date here, there were well-known techniques to compensate for the signal degradation that occurred in an optical system. For instance, Dr. Smith noted that as of 1999, "[i]ssues such as amplifier gain stabilization . . . were well understood and had reached a degree of standardization." (D.I. 418, ex. 67 at A1095 at ¶ 10)

20

signal conditioning technique, it would have claimed it." (D.I. 502 at 4)  Indeed, when '229 patent inventor Abdella Battou was asked if his patent "describe[d] or claim[ed] signal conditioning[,]" he replied that "[m]y patent is not about signal conditioning. It's not about conditioning." (D.I. 494 (hereinafter, "Alcatel's Second Appendix"), ex. 16 at A873)[17]

And third, while Lambda suggests that the *patent's specification* recites certain requirements that the MONET articles must enable—by asserting that "[a] court may consult the specification to determine that a prior art reference did not enable a patented invention's characteristics, even if those characteristics are not recited in the claims[,]" (D.I. 488 at 7-8)—it fails to persuasively explain *why* this is in fact the case here.

As an initial matter, the Court agrees with Alcatel that Lambda is misreading the sole case that it cites in support of this proposition: *Application of Sheppard*, 339 F.2d 238 (C.C.P.A. 1964). (D.I. 502 at 3)  In *Application of Sheppard*, the patent claimed certain chemical compounds, and the specification stated that the compounds are "'characterized by excellent thermal and chemical stability[.]'" 339 F.2d at 238-39. The Court concluded that the examiner should not have rejected certain claims as anticipated over a prior art reference where the author of that reference failed to "alter the reaction conditions or reactants in order to make a stable pentafluoride[,]" and that the reference was therefore not enabling. *Id.* at 241-42. The Court agrees with Alcatel's view that the case "stands for the unremarkable proposition that an unsuccessful attempt to make a chemical is not enabling." (D.I. 502 at 3); *see also In re*

---

[17]     Even Dr. Smith acknowledged during his deposition that at least "some" aspects of the patent specification dealing with signal conditioning (such as optical amplification, transient management, and optical signal monitoring) would have been known by the POSITA at the relevant time. (Lambda's Appendix, ex. 10 at A0459-61, A0467-68)

21

*Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985) (distinguishing *Application of Sheppard* simply as a case where "the reference[] [was] deemed insufficient, because [it] stated that attempts to prepare the claimed compounds were unsuccessful").

Separate and apart from that, the Court would expect Lambda to point out in some detail what are the *portions of the asserted patent's specification* that supposedly support its argument (i.e., that show that "a prior art reference did not enable a patented invention's characteristics, even if those characteristics are not recited in the claims") and *why* they show that Lambda's argument is viable. Lambda did not do so, however. Instead, Lambda simply cited to several paragraphs from the reports of Dr. Smith and from Dr. Prucnal, in support of the notion that a device such as the one claimed in the '229 patent must "be able to generate stable optical signals for use in an optical network[.]" (D.I. 488 at 8) Only one of those paragraphs actually refers to a specific portion of the text of the patent specification: paragraph 60 of Dr. Smith's supplemental expert report, which in turn refers to Figure 11 of the patent, which itself depicts a "preferred embodiment for the transport ingress subsystem[.]" (Lambda's Appendix, ex. 1 at ¶ 60 (*cited in* D.I. 488 at 8)) In this paragraph of his report, Dr. Smith states that Figure 11 "contains optical signaling channel (OSC) extraction as well as an optical performance monitor (OPM)" and that "[t]ransient control is thus present in the figure and an ordinary skilled artisan would understand the problem, even as described as a problem in MONET, but not disclosed as how to be solved by MONET[.]" (*Id.*)

Yet in this paragraph, Dr. Smith does not explain (and Lambda does not further explain in its briefing) *how* it is that the Court should understand Figure 11 to explain why "a prior art reference [the MONET articles] did not enable a patented invention's characteristics, even if

22

those characteristics are not recited in the claims." That is, in paragraph 60 of his report, Dr.

Smith does not articulate *why*: (1) Figure 11 explains that the problem of how to deal with signal

degradation (or how to achieve sufficient signal conditioning/transient control) was something

not already well understood to a person of skill in the art; or (2) Figure 11 explains that this was

an unsolved "problem" as of February 2001 (or, for that matter, as of the time of the MONET

articles).[18] (*See* Lambda's Appendix, ex. 11 at A0736-37 (Dr. Pruncal stating that Figure 11

"shows [] a box labeled optical transient suppression. . . . [which is] a well-known phenomenon

[as] [i]t's well-known that that has to be addressed in design, and it doesn't by itself . . . tell us

how to do that")) Therefore, Lambda has not demonstrated that anything in the '229 patent's

specification discloses unclaimed requirements that the MONET articles must enable. *See, e.g.,*

*Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) (holding that

an expert's conclusory opinion unsupported by explanation or reasoning was not sufficient to

create a material fact dispute); *Premium Sales Network, LLC v. Masterspas, Inc.*, CASE NO.

8:15-cv-2431-17AEP, 2016 WL 7325478, at \*6 (M.D. Fla. Dec. 15, 2016) (noting that an

expert's conclusory statement that fails to provide a specific explanation for the expert's opinion

"does not provide competent evidence for purposes of summary judgment"); *Leonard v.*

---

[18]    Additionally, the Court reiterates that the undue experimentation inquiry "is a
legal determination reached by considering underlying factual findings[,]" and that among those
considerations are the illustrative *Wands* factors. *See Wm. Wrigley Jr. v. Cadbury Adams USA
LLC*, No. 04-cv-346, 2010 WL 1325732, at \*2 (N.D. Ill. Mar. 30, 2010). While it is true that Dr.
Smith's 87-page supplemental expert report did refer to certain of the *Wands* factors, Lambda's
brief did not mention them. (D.I. 502 at 3) This is complex technology and a "fact-laden"
inquiry, and therefore it would have been helpful if, in its brief, Lambda had tied its arguments,
and any applicable evidence, to the relevant *Wands* factors. *See Wm. Wrigley Jr.*, 2010 WL
1325732, at \*2.

*Stemtech Health Sciences, Inc.*, Civil Action No. 08-067-LPS-CJB, 2011 WL 6046701, at \*23 (D. Del. Dec. 5, 2011) (noting that an expert's conclusory opinion—which lacked an explanation as to why the expert has that opinion and reference to any underlying facts in the record that would support that conclusion—cannot be relied upon as a fact).

Much of the remainder of Lambda's briefing is directed to asserting that even if MONET had resolved the signal conditioning requirements needed to make the claimed switching system, the MONET references would not enable a skilled artisan to make the claimed node without undue experimentation. (D.I. 488 at 11-18; *see also id.* at 11-12 ("However, even if MONET *had achieved* transmitting useable signals through optical and access networks, the MONET articles would still fail to instruct a [POSITA] *how* to implement these solutions to build the claimed switching system.") (certain emphasis added, certain emphasis in original))[19] But for the

---

[19]    Lambda also reiterates an argument that it made in the prior briefing and that the Court credited in the First Invalidity R&R, (D.I. 442 at 13-14), asserting that (1) Alcatel did not introduce a commercial product incorporating the inventions of the '229 patent until March 2002 despite being in possession of the lessons learned in MONET by November 1999, and (2) that this is "evidence that the MONET references were not enabled[,]" (D.I. 488 at 11). However, in Judge Andrews' decision regarding the First Invalidity R&R, he explained that Lambda's attorney's position on this issue was not sufficient to create a dispute of fact about enablement and that "[e]xpert testimony is, without a doubt, needed on the ultimate issue, should we get there, but I think it is also needed to raise the issue." (D.I. 464 at 5) Here, Lambda's recycled argument is not sufficient to create a genuine dispute of material fact, as Lambda does not cite to any expert testimony in this section that provides an analysis with respect to this issue. Lambda does assert that Alcatel "tries to counter this evidence by arguing it sold a reconfigurable node in the form of the LambdaRouter in July 2000[,]" (D.I. 488 at 11 (citing D.I. 484 at 9 n.12)), and it then cites to portions of Dr. Smith's expert report in which he opines that the LambdaRouter did not practice the claims of the asserted patent, (*id.* (citing Lambda's Appendix, ex. 13 at ¶¶ 83-88)). But it does not cite to any expert testimony that supports its overarching position on this issue—that confirms that the evidence demonstrates that it took Alcatel until March 2002 before it was able to introduce a commercial optical networking product that practiced the claims, and that this is further proof that the MONET articles were not enabling. Such testimony is necessary for this issue to create a genuine issue of material fact with respect to enablement in light of Judge Andrews' prior order (and it also seems especially necessary here, in light of Alcatel's

reasons set out above, Lambda has failed to persuade the Court that to make any embodiment of the claimed switching system, the skilled artisan would be required to resolve unclaimed signal conditioning issues in novel ways (and that the MONET references would thus need to be enabling on this score), and so this argument fails. In sum, because this argument of Lambda's on summary judgment focuses on requirements that are (1) not found in the asserted claims and (2) for which there is no evidence that they were anything other than well-known in the art of optical networking as of February 2001, then Lambda has failed to meet its burden of rebutting the presumption that the MONET articles are enabled with respect to this argument.[20]

That conclusion, however, does not end the enablement analysis. As the Court will explain below in addressing anticipation, there remains a genuine dispute as to whether any or all of the MONET references discloses the capability of the switch subsystem to direct optical signals to or receive optical signals from an access network. Therefore, Lambda has generated a material dispute of fact as to whether the MONET references enabled a POSITA to make a claimed switch system that includes this claim limitation. (*See* D.I. 488 at 13 ("This is part of the enablement issue Dr. Smith states is missing from MONET, e.g., the MONET articles did not enable the capability to connect to access networks.") (citing, *inter alia*, Lambda's Appendix, ex. 1 at ¶¶ 147, 200, 204, 208-209; *id.*, ex. 10 at 112))

---

response that "there is no evidence Lambda itself ever deployed the type of switch Lambda now demands must be enabled"). (D.I. 502 at 7 (citing D.I. 362, ex. 6 at A95))

[20]    Also pending before the Court is Alcatel's Motion to Strike Expert Report Produced After Deadline ("Motion to Strike"), (D.I. 492), in which it seeks to strike as untimely the declaration of Dr. Smith that Lambda submitted with its brief on enablement, (*id.* at 2-3). Given the Court's conclusion with respect to the primary enablement issue that the parties focused on in their supplemental briefing, the Court DENIES AS MOOT Defendants' Motion to Strike.

25

## B.    Anticipation

The Court now turns to whether Alcatel has shown that there is no genuine dispute of material fact as to whether one or more of the MONET references discloses every limitation of the asserted claims of the '229 patent.  The focus of the First Invalidity R&R was the claims' requirement that the switch subsystem be capable of directing optical signals to or receiving optical signals from an access network (defined as "a network external to the optical network"). (D.I. 442 at 11 & nn.7-8, 16-18 & nn.15-16)  While the Court did not substantively assess whether each of the MONET references anticipated the claims of the '229 patent in light of its conclusion with respect to enablement, (*id.* at 13-14), with respect to obviousness, the Court found that, *inter alia*, a genuine issue of material fact existed as to whether the MONET references disclosed connection to an optical access network (or alternatively, whether it would have been obvious to the skilled artisan to connect the transport network disclosed in the MONET references to an access network), (*id.* at 16-18).

Here again, the record continues to demonstrate a genuine dispute of material fact as to whether each of the MONET references disclosed this requirement.  In significant part, this is due to the fact that Alcatel's supplemental briefing on the issue essentially reiterates its prior positions.

For one thing, Alcatel asserts again that "Lambda's expert has already admitted the optical access subsystems of MONET were capable of being connected to an access network." (D.I. 484 at 8 (citing Alcatel's First Appendix, ex. 11 at A592-96, A599-600))  But as the Court explained in the First Invalidity R&R, "[w]hile Dr. Smith acknowledges [in these portions of his deposition] that the MONET articles disclose certain subsystems that *might be possible* to link to

26

an access network, Alcatel stretches his testimony too far to the extent it characterizes it as

describing an actual, definitive connection." (D.I. 442 at 17 (emphasis in original); *see also* D.I.

488 at 13)[21]  Indeed, Dr. Smith's supplemental report prepared with respect to enablement

emphasizes his opinion that the "testbed-to-testbed system" of MONET did not practice the

claimed invention,[22] (Lambda's Appendix, ex. 1 at ¶ 200), and he testified at his supplemental

March 2016 deposition that the MONET team "did not practice all of the elements of the claim

because they did not access an access network[,]" (*id.*, ex. 10 at A0491).[23]

---

[21]    Lambda has argued that the most that can be said with respect to this testimony is that Dr. Smith "agreed the figures shown to him depicted a *theoretical connection* to an access network, not that such connection is possible[,]"—and that this is buttressed by the disclosure in Anderson that while a SONET protocol (e.g., OC-48c) was being utilized in the experimental testbeds, "there is no SONET equipment [necessary to connect to access networks] involved." (D.I. 452 at 9 & n.17 (citing Alcatel's First Appendix, ex. 1 at A054) (emphasis in original))

[22]    Lambda has consistently argued that the MONET references do not disclose the claimed invention because they "used test beds, not access networks, to supply outputs to prove the feasibility of transmitting multiple wavelengths over an optical network." (*See, e.g.*, D.I. 392 at 10; *see also id.* at 12 ("The Anderson article, which summarizes the entire MONET project, clearly demonstrates that the descriptions of the use and arrangement of equipment in Wagner, Gottlieb, Johnson, and Anderson referred to testbeds which were *directly connected* to the MONET network elements to supply optical signals to prove the feasibility of multiplexing multiple wavelengths and transmitting the multiplexed optical signal over the fiber optic network. Articles describing the MONET project did not address the use of the claimed access network.") (emphasis in original))

[23]    In its supplemental reply brief, Alcatel contends that Dr. Smith "admitted MONET *did* drop signals to 'the access network' in his prior report." (D.I. 502 at 8 n.9 (emphasis in original))  Here, Alcatel is citing to a single sentence of Dr. Smith's earlier rebuttal report, which responded to Dr. Prucnal's Invalidity Report, and which was submitted to the Court in connection with the First Invalidity R&R. (*Id.*)  This sentence is in a section of Dr. Smith's report entitled "[t]he egress access line interface [disclosed in dependent claims 15 and 16] is neither present nor obvious from the described network elements [of the MONET references]" and it states: "Signals that are directly dropped to the access network (as in the MONET architecture) will typically have excess optical noise including chromatic dispersion, timing jitter and amplified spontaneous emission." (D.I. 395, ex. 9 at A150, A153)  When this sentence is viewed in its proper context, it is clear that it was not intended as an admission establishing no

Second, Alcatel reiterates its argument that the MONET articles disclose access subsystems "'adapted to'" exchange data with access networks and specifically disclose access networks themselves in the process.  (D.I. 484 at 8 n.9)  In support it cites, for instance, the reference in Johnson that "A *CCI* [compliant client interface] is a single-wavelength interface between the optical server layer network (that is, MONET) and the *client network* that uses a MONET-compliant wavelength."  (*Id.* (citing Alcatel's First Appendix, ex. 1 at A027) (emphasis in Alcatel's brief))  But the Court already addressed this argument in the First Invalidity R&R, explaining that this point failed to demonstrate the absence of a triable fact in light of, *inter alia*: (1) Alcatel's failure to offer expert testimony in support of this position;[24] and (2) Lambda's push back that "the MONET references' usage of the term 'client' does not suggest connections to access networks, but instead refer to 'test equipment such as HDTV signal generators, a tape deck or computer workstations.'"  (D.I. 442 at 18 (internal citations omitted))

In sum, whether any or all of the MONET references disclosed the capability of the switch subsystem to direct optical signals to or receive optical signals from an access network

---

genuine dispute with respect to the requirement that the claimed switch subsystem be capable of connecting to an access network.  Throughout this very same report, Dr. Smith refers to the lack of disclosure of an access network in each of the MONET references.  (*See, e.g.*, D.I. 395, ex. 9 at A142, A156, A166, A168, A170)  Thus, it is not at all clear from this single sentence (in a section regarding dependent claims 15 and 16) that Dr. Smith believes that the MONET references disclose the capability of the subsystem to direct optical signals to or receive optical signals from an access network as required by the claims.

[24]    The Court notes that, although Alcatel did not cite to any supporting expert testimony, Dr. Prucnal did state in his report that "[t]he MONET references explicitly refer to a connection to a 'client network'" and that "[t]he terms 'client network' and 'access network' are interchangeable with respect to the MONET references." (Alcatel's First Appendix, ex. 13 at ¶ 85 (internal citations omitted))  Even if this statement supports Alcatel's position, however, in light of Dr. Smith's contrary position (and the facts referred to therein), there remains a genuine dispute between the parties with respect to this issue.

remains in dispute.  Therefore, Alcatel's Motion does not satisfy its high burden of proving that any or all of the MONET references taught every limitation in the asserted claims of the '229 patent.[25]

## IV.   CONCLUSION

For the reasons set out above, the Court recommends that Defendants' Motion (D.I. 363) be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly

---

[25]      Because the Court has found that summary judgment cannot be granted in Alcatel's favor with respect to independent claims 1 and 25, there is no need to address Alcatel's other anticipation-related arguments regarding the dependent claims, which depend from claim 1. (D.I. 484 at 16-19); *see, e.g.*, *Medtronic Vascular Inc. v. Abbott Cardiovascular Sys., Inc.*, 614 F. Supp. 2d 1006, 1017 (N.D. Cal. 2009) (denying motion for summary judgment on the issue of anticipation with respect to independent claim, and concluding that "since the dependent claims of the [asserted] patent . . . all depend upon [the] independent claim[, as to which there was a dispute of material fact, then], there is a dispute of material fact as to these [dependent] claims, as well").

proposed, redacted version (if necessary) of the Report and Recommendation.  Any such redacted version shall be submitted no later than **April 7, 2017** for review by the Court, along with a specific, detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated:  March 31, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE